Affirmed and Opinion filed January 12, 2006









Affirmed
and Opinion filed January 12, 2006.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-00790-CV

____________

 

DONALD DAVIS, Appellant

 

V.

 

FISK ELECTRIC
COMPANY, FISK TECHNOLOGIES, AND 

FISK
MANAGEMENT INC., Appellees

 



 

On Appeal from the 269th
District Court

Harris County, Texas

Trial Court Cause No. 02-25431

 



 

O P I N I O N








Appellant Donald Davis sued appellees Fisk
Electric Company, Fisk Technologies, and Fisk Management Inc. (AFisk@) for wrongful
termination, alleging that his termination was based on race.  A jury found that race was not a motivating
factor in Davis=s termination.  In five issues, Davis complains that (1) the
trial court erred in overruling Davis=s objections to
Fisk=s peremptory
strikes on the basis that they were exercised in violation of Batson v.
Kentucky, 476 U.S. 79 (1986), (2B3) the evidence is
legally and factually insufficient to support the verdict, (4) the trial court
erred in four of its evidentiary rulings, and (5) the trial court erred in
denying Davis=s post-trial motion for sanctions based on
discovery violations.  We affirm.

                                Factual and Legal Background

Fisk is in the business of installing
cable for construction projects.  Davis
worked on Fisk projects for several years as a union employee until he accepted
an entry-level management position with Fisk in August 2000.  Fisk undertook a project at Goodson Middle
School (AGoodson@), which was
scheduled for completion by June 4, 2001. 
Harry Stein was the project manager for this and several other Fisk
projects, and Davis was assigned to be the assistant project manager.  Because of demands on his time from the other
projects, Stein was unable to closely monitor the work at Goodson, and so
Davis, who had only one project, was placed in charge in Stein=s absence.

By all accounts, the Goodson project
turned out to be a total disaster.  The
project was mismanaged, over budget, behind schedule, and rife with errors,
resulting in costly and time-consuming repairs. 
Fisk ended up going $40,000 over budget on this $100,000 project.  In mid-May 2001, Stein learned there were problems
with Goodson and became concerned that the project could not be completed on
time.  Consequently, Stein went for help
to Charles Blanton and Matt Kenjura, two assistant vice presidents for Fisk,
who had not previously been involved with Goodson.  Kenjura asked Blanton and Stein to further
investigate, and soon thereafter they walked through the project.  After the walk-through, Blanton called the
project Athe biggest
travesty [he had] ever witnessed in the data cabling business.@  Stein agreed with Blanton=s assessment and,
according to Blanton, asked for a new assistant project manager.  Davis was relocated to the office to handle
paperwork and was terminated about three weeks later.  The project foreman, George Thomas, who, like
Davis, is African-American, was terminated as well.  Stein, who is caucasian, was reprimanded.








Davis was given a termination letter
detailing the problems with the Goodson project that led to his
termination.  Davis claimed he was not
responsible for any of the project=s
deficiencies.  Instead, he blamed Thomas
for not properly monitoring the daily progress of the job and Stein for not
providing the manpower and other assistance Davis claims he needed.  Davis concluded that his termination was
racially motivated and, after filing a charge of discrimination with the Equal
Employment Opportunity Commission (AEEOC@), sued Fisk for
race discrimination under the Texas Commission on Human Rights Act (ATCHRA@), Tex. Lab. Code Ann. ' 21.051 (Vernon
1996), and 42 U.S.C. ' 1981 (2000).[1]

Before the trial court entered its final
judgment, Davis filed a post-trial motion for sanctions, alleging that Davis
had learned for the first time during trial that Fisk had falsified some of its
discovery responses.  The trial court
entered its final judgment on May 21, 2004 and then signed a separate order denying Davis=s motion for
sanctions on June 24,
2004.  Davis appeals from both of these orders.

                                                      Analysis

                                        Legal
and Factual Sufficiency

In his second and third issues, Davis
challenges the legal and factual sufficiency of the evidence to support the
jury=s verdict.  When a party attacks the legal sufficiency of
the evidence supporting an adverse finding as to an issue on which it has the
burden of proof, the party must demonstrate on appeal that the evidences
establishes, as a matter of law, all vital facts in support of the issue.  Dow Chem. Co. v. Francis, 46 S.W.3d
237, 241 (Tex. 2001).  In making this
determination, we examine the record for evidence that supports the finding,
while ignoring all evidence to the contrary. 
Id.  We will sustain the
challenge only if the contrary proposition is conclusively established.  Id.  








When a party attacks the factual
sufficiency of the evidence supporting an adverse finding as to an issue on
which it has the burden of proof, the party must demonstrate on appeal that the
finding is against the great weight and preponderance of the evidence.  Id. at 242.  In conducting a factual sufficiency review,
we consider and weigh all the evidence and can set aside the verdict only if
the evidence is so weak or if the finding is so against the great weight and
preponderance of the evidence that it is clearly wrong or unjust.  Id. 
The trier of fact is the sole judge of the credibility of the witnesses
and the weight to be given to their testimony. 
GTE Mobilnet of S. Tex. Ltd. P=ship v. Pascouet, 61 S.W.3d 599,
615B16 (Tex. App.CHouston [14th
Dist.] 2001, pet. denied).  We may not
substitute our own judgment for that of the trier of fact, even if we would
reach a different answer on the evidence. 
Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998).

In a race discrimination case under the
TCHRA, it is the employee=s burden to prove race was Aa motivating factor@ in the employer=s decision to
terminate.  Wal-Mart Stores, Inc. v.
Canchola, 121 S.W.3d 735, 739 (Tex. 2003). 
The jury found that Davis had not met this burden.  Davis alleges the evidence is insufficient to
support a finding that race was not a motivating factor in his termination,
pointing primarily to evidence that (1) Blanton, whom he contends was the
decision maker, used a racial epithet in close temporal proximity to the
termination decision and (2) Fisk=s reason for
terminating him was false.

Davis contends that Blanton is a racist
who decided to terminate him because of his race and then took steps to conceal
his racism and make the reasons for Davis=s termination
appear legitimate.  At trial, Stein
testified that after he and Blanton returned from walking through the project
and witnessing its vast problems, Blanton said he was going to terminate
Davis.  In response, Stein told Blanton
that the problems at Goodson were his fault, not Davis=s, and that if
anyone deserved termination, it was Stein. 
Stein, who had apparently previously been accused of racism after
terminating a minority employee, warned Blanton that since he did not have
grounds for termination and since Davis was African-American, Davis might
complain to the EEOC if Blanton terminated him. 
Stein said that Blanton referred to Davis as a An-----@ and said Davis
would be terminated, although Stein could not recall the exact statement.  Davis also introduced evidence that Blanton
used racial slurs outside the workplace.








According to Davis, after Stein warned
Blanton that he did not have grounds for terminating Davis, Blanton removed
Davis from the project and then spent the next three weeks building a case to
terminate Davis and covering for his discrimination.  Stein testified that Blanton wrote Davis=s termination
letter in which he detailed the problems at Goodson.  According to Stein, Blanton said he was also
giving Stein a detailed disciplinary letter only to appear fair if Davis filed
an EEOC complaint.  Similarly, Stein
claimed that Blanton rehired George Thomas, the African-American project
foreman, only to appear fair if Davis contacted the EEOC.  Davis, Stein, and Elliott Avery, a senior project
manager and chief estimator for Fisk, testified that Davis was not responsible
for the failures at Goodson and that Davis did what he could in his limited
capacity as assistant project manager to make the project successful.  Davis contends that Blanton actually made the
project worse before his termination by assigning Raymond Garcia, a project
supervisor, to Goodson and allowing Garcia to run up over $18,000 in labor
costs over one weekend when the project was already over ninety percent
complete.  According to Davis, this
evidence establishes as a matter of law that Fisk=s reason for
terminating him was false and that race was a motivating factor, or at least
that the jury=s finding to the contrary was against the
great weight and preponderance of the evidence.

Fisk presented evidence disputing Davis=s account of his
termination.  According to Blanton, Stein
requested a new assistant project manager after the walk-through revealed the
extensive problems at Goodson, which Stein blamed largely on Davis.  Blanton and Kenjura testified that Kenjura
agreed to deal with the Goodson situation because Kenjura had hired Davis.  Kenjura transferred Davis from working at the
project site to doing paperwork in the office. 
Kenjura asked Garcia to gather more information on the status of
Goodson, and they concluded that the project was not over ninety percent complete,
as Davis had represented, but closer to sixty or seventy percent complete, and
the project deadline was only a few weeks away. 
Kenjura authorized Garcia to bring in extra help and work extensively
over one weekend in an attempt to put the project back on track.  Acccording to Kenjura, this additional effort
allowed the project to be completed on time, thereby avoiding a late penalty.








Kenjura testified that he was the first to
recommend that Davis be terminated and that he based this recommendation on
Davis=s poor performance
on this and other projects, in conjunction with his failure to take any
responsibility for the problems at Goodson. 
Both Kenjura and Blanton testified that Davis, as assistant project
manager, was the highest-ranking Fisk employee who was on-site on a regular
basis and that Davis was responsible for ensuring that the work was done
properly.  This testimony was
corroborated by several other witnesses, including Stein and Avery, who
admitted on cross-examination that Davis had at least some responsibility to
ensure the job was done right.  Blanton
testified that he agreed with Kenjura that Davis should be terminated but
thought they should wait until after Goodson was finished because Davis knew
the project best and could assist in its completion.  Because he had hired Davis, Kenjura was the
primary decision maker, and when Clayton Sellers, a Fisk vice president and
superior of both Blanton and Kenjura, did not overrule Kenjura=s recommendation
to terminate Davis immediately, the termination went forward.  Because Blanton=s job included
handling personnel issues, he drafted the termination letter and other
termination paperwork.








Blanton=s testimony
contradicted nearly all of Stein=s testimony
regarding their conversations about Davis. 
Blanton denied recommending termination immediately upon returning from
the Goodson walk-through or giving Stein a disciplinary letter only to conceal
his racism toward David from the EEOC. 
According to Kenjura and Blanton, Stein did not say that he opposed the
termination or that he should be terminated instead of Davis.  When Blanton sought Stein=s input on a draft
of Davis=s termination
letter, Stein said that Fisk should be careful in its dealings with Davis
because he might file a discrimination complaint with the EEOC.  Blanton became angry that Stein injected race
into the discussion when race had nothing to do with Davis=s
termination.  Although Blanton said he
cannot recall whether he used the word An-----@ in his
conversation with Stein, he contends that even if he did, the only motivating
factor for his actions was Davis=s performance, not
his race.  Indeed, Stein said he could
not remember the exact context of Blanton=s statement, but
one possible interpretation was something like, AEven if Davis is a
n-----, that does not mean we cannot terminate him.@  Blanton also denied following Stein=s suggestion to
rehire Thomas to defend against an EEOC charge, claiming instead that he
rehired Thomas to improve Fisk=s relations with
Thomas=s union, which was
protesting the termination.  Finally,
Blanton denied making the project worse to manufacture a basis for Davis=s termination or
basing Davis=s termination on problems that occurred
after Davis left.  Rather, the
termination letter was based on what Blanton saw at the walk-through, which
occurred before Davis was replaced.

The jury heard substantial and conflicting
evidence on nearly every relevant fact, and it was the jury=s role to
determine which version of events to believe. 
We conclude that the evidence is legally and factually sufficient to
support the jury=s finding that race was not a motivating
factor in Fisk=s decision to terminate Davis=s employment.  We overrule Davis=s second and third
issues.

                                                 Batson
Challenge

Fisk exercised five of its six peremptory
challenges on African-American jurors, leaving only one African-American juror
on the panel ultimately selected.  Davis
alleged that these five peremptory challenges were racially motived and
therefore improper under Batson v. Kentucky, 476 U.S. 79 (1986).  The trial court overruled Davis=s Batson
objections.  In his first issue, Davis
contends the trial court Arefused to allow him to demonstrate the
falsity of Fisk=s reasons@ and erred in
overruling his Batson objections.








Resolution of a Batson challenge
involves a three-step process.  First,
the opponent of the peremptory challenge must establish a prima facie case of
racial discrimination.  The burden then
shifts to the party exercising the strike to articulate a race-neutral
explanation.  Finally, the trial court
must determine whether the opponent of the strike has proven racial
discrimination.  See Purkett v. Elem,
514 U.S. 765, 767B68 (1995); Goode v. Shoukfeh, 943
S.W.2d 441, 445 (Tex. 1997).  ABecause the party
challenging the peremptory strikes has the ultimate burden of persuasion, we
conclude that the trial court should provide the party challenging the strikes
. . . a reasonable opportunity to rebut the race-neutral explanations.@  Goode, 943 S.W.2d at 452 (citations
omitted).  Davis claims the trial court
did not follow this procedure because it did not allow him an opportunity to
rebut Fisk=s reasons.

Davis made his Batson objections,
and the trial court then allowed Fisk to articulate its race-neutral reasons
for striking each juror.  After Fisk
offered its explanation for striking the first juror, the trial court found
that Fisk had proven a race-neutral reason for the strike and overruled the
objection.  Davis=s counsel then
asked Ato say something,
just to preserve the record,@ and the trial
court asked her to wait until Fisk had finished offering all its
explanations.  Fisk then explained each
of its four other strikes, and the trial court overruled the Batson
challenge to each one.  The trial court
then gave Davis an opportunity to Amake [a] bill,@ and Davis=s counsel gave a
brief argument as to each juror to rebut Fisk=s race-neutral
reasons.  The trial court then reiterated
its ruling that Fisk=s strikes were not racially motivated and
again overruled the Batson objections. 
The trial court then asked, AAnything else
before we continue?,@ and Davis=s counsel
responded, ANothing on Batson.@

Davis did not timely object to the trial
court=s alleged failure
to follow proper Batson procedure. 
Batson challenges are subject to ordinary rules of procedural
default, and it was Davis=s duty to bring the alleged error to the
trial court=s attention when the trial court was in a
position to remedy the situation.  See
Brumfield v. Exxon Corp., 63 S.W.3d 912, 919 (Tex. App.CHouston [14th
Dist.] 2002, pet. denied); Flores v. State, 33 S.W.3d 907, 926 (Tex.
App.CHouston [14th
Dist.] 2000, pet. ref=d). 
Davis claims that his counsel attempted to object but was interrupted by
the trial court.  However, Davis=s counsel Anever attempted to
later articulate a clear objection that would sufficiently apprise the trial
court of the specific complaint.@  Yazdi v. Republic Ins. Co., 935 S.W.2d
875, 879 (Tex. App.CSan Antonio 1996, writ denied).  The record is clear that the trial court did
not know Davis was alleging improper Batson procedure until the hearing
on Davis=s motion for new
trial.  Because Davis did not timely
object to the trial court=s alleged failure to hold a proper Batson
hearing, he has waived this argument on appeal. 
See Brumfield, 63 S.W.3d at 917, 919; Flores, 33 S.W.3d at
926.








Even if Davis had preserved error on this
issue, we conclude the trial court conducted a proper Batson
hearing.  The trial court gave Davis a
full opportunity to make any arguments on the Batson issue, and when the
trial court asked if the parties had anything else to say before they
continued, Davis=s counsel replied, ANothing on Batson.@  Davis complains that the trial court ruled
before hearing his arguments.  The trial
court made a ruling and then, after expressly considering Davis=s arguments,
reiterated its prior ruling.  That the
trial court allowed argument after ruling but was not persuaded to change its
ruling does not vitiate the hearing Davis was given.  See Thottumkal v. McDougal, No.
14-03-00807-CV, 2004 WL 1607649, at *2 (Tex. App.CHouston [14th
Dist.] July 20, 2004, pet. denied) (mem. op.).

We now turn to the substance of Davis=s Batson
claim.  In a civil case alleging a Batson
violation, we review the trial court=s decision for an
abuse of discretion.  Goode, 943
S.W.2d at 446.  A trial court abuses its
discretion if its actions are arbitrary, unreasonable, or without reference to
guiding rules or principles.  Id.  We will not substitute our judgment for that
of the trial court in its resolution of factual issues underlying its decision.
 Id.  Because the Texas
criminal jurisprudence on Batson issues is much more developed than the
civil jurisprudence, we may look to criminal cases for guidance.  Id. at 450.








On appeal, Davis makes detailed arguments
challenging each one of Fisk=s strikes of
African-American jurors, including comparing those jurors to white jurors who
were not struck.[2]  Both parties Aare allowed to
raise, for the first time on appeal, arguments to rebut or support,
respectively, the race-neutral explanations given at trial, provided that the
evidence necessary to support those arguments was developed in the record.@  Francis v. State, 909 S.W.2d 158, 163
(Tex. App.CHouston [14th Dist.] 1995, no pet.).  This includes developing comparisons between
jurors who were not struck.  See Young
v. State, 826 S.W.2d 141, 146 (Tex. Crim. App. 1991); Contreras v. State,
56 S.W.3d 274, 280 (Tex. App.CHouston [14th
Dist.] 2001, pet. ref=d).

Juror No. 5, Michael Pickett

During voir dire, Michael Pickett said
that he had been discriminated against in the past but that he nonetheless
believed he could be fair and unbiased. 
He also indicated that although he would still listen to all the
evidence regarding the reason for Davis=s termination, the
fact that Blanton had used the word An-----@ was Aa real big
problem.@  In the Batson hearing, Fisk=s counsel
explained that he struck Pickett because of his prior experience with
discrimination and because he was one of the jurors with the strongest
reactions to the use of the An-----@ word.  Fisk=s counsel claimed
that Pickett laughed when a white juror made a comment about having an
African-American friend.  Finally,
Pickett is a musician at a church, which Fisk=s counsel believed
might make him susceptible to layoffs and thus not a good defense juror in a
termination case.








Davis argues that Fisk impermissibly
targeted Pickett and the African-American jurors generally by asking
race-related questions to elicit responses that would serve as bases to strike
them.  For example, Fisk asked which
jurors had suffered Athe sting of racial discrimination@ and solicited
their response to the allegation that Blanton had used the An‑‑‑‑‑@ word.  Disparate questioning can be evidence of
pretext.  See Miller-El v. Dretke,
125 S. Ct. 2317, 2333B38 (2005). 
However, Fisk asked these questions of the entire panel, not only of the
African-American jurors.  Further, it was
Davis, not Fisk, who initiated a discussion of race during voir dire.  In race discrimination cases, race is an
inevitable part of the trial.  In such
cases, jurors= racial views are relevant and may be explored
during voir dire, even if African-American jurors are more likely to have
racial views one party may find more or less favorable.  See Georgia v. McCollum, 505 U.S. 42,
59 (1992) (A[T]here is a distinction between
exercising a peremptory challenge to discriminate invidiously against jurors on
account of race and exercising a peremptory challenge to remove an individual
juror who harbors racial prejudice.@); Gerber v.
State, 845 S.W.2d 460, 466 (Tex. App.CHouston [1st Dist.]. 1993, pet. ref=d) (holding that
striking juror because of fear she may identify with the victim is a Acase-related,
race-neutral explanation@). 
Thus, in this case, questions about jurors= personal
experiences with discrimination and reactions to the use of the word An-----@ were legitimate
and can properly serve as a basis for exercising peremptory challenges.

Davis also argues that Fisk cannot rely on
reasons for strikes based on nonverbal responses from jurors that are not
reflected in the record through specific detailed evidence.  We reject this argument.  Fisk=s counsel
explained at the Batson hearing that he struck Pickett because he
laughed when a white juror said he had an African-American friend and because
he had a strong reaction to the An-----@ word issue.  Fisk=s counsel also
said he struck other jurors based on similar nonverbal cues.  Davis=s counsel did not
dispute these occurrences but instead asserted that no evidence in the record
supported Fisk=s counsel=s claim.  However, A[a] counsel=s statement about
an occurrence in the courtroom, which was made for purposes of the record,
recorded by the court reporter, undisputed by the opposing counsel, and
unquestioned and unqualified by the judge in whose presence the statement was
made, establishes the occurrence for purposes of the appellate record.@  Yarborough v. State, 947 S.W.2d 892,
895 (Tex. Crim. App. 1997).  Under these circumstances, counsel=s observations
alone constitute valid proof of the matter asserted.  See id. at 894B95; Contreras,
56 S.W.3d at 280.  








AMuch of the voir
dire decision process does turn upon intangibles and interpretation of
non-verbal behavior.  Not every
explanation of a strike on such basis can be summarily disbelieved.@  Munson v. State, 774 S.W.2d 778, 780 (Tex. App.CEl Paso 1989, no
pet.).  It is the trial court=s responsibility
to scrutinize voir dire and the jurors= demeanor
carefully in assessing the legitimacy of the reason given for the strike, and
we accord great deference to the trial court=s
determination.  See Peetz v. State,
No. 14-04-00642-CR, __ S.W.3d __, 2005 WL 3005660, at *3 (Tex. App.CHouston [14th Dist.] Nov. 10, 2005, no
pet. h.); Lewis v. State, 852 S.W.2d 667, 670B71 (Tex. App.CHouston [14th Dist.] 1993, no
pet.).  Here, the trial judge
specifically noted that he had taken notes and observed the jurors= demeanor on a
number of questions, including Fisk=s race-related
questions.  Fisk=s counsel=s uncontradicted
assertions, supported by the trial court=s observations,
constitute valid proof of the nonverbal bases for striking Pickett and the
other jurors in this case, who will be discussed in turn below.

Finally, Davis disputes Fisk=s counsel=s rationale for
striking Pickett based on his employment as a musician.  Davis contends no evidence supports Fisk=s reasoning that
musicians are more likely to be laid off and that relying on such stereotypes
without evidence specifically linking the stereotype to Pickett is an
impermissible group bias that suggests pretext. 
See Whitsey v. State, 796 S.W.2d 707, 714 (Tex. Crim. App. 1989).  The group bias theory applies when, for
example, counsel strikes a teacher based on a belief that all teachers are liberal.  See id. at 716.  That differs from this case in which Pickett
was struck because of a characteristic of the job itself rather than a
stereotype about people who hold such a job.








Davis points out that several white jurors
who were unemployed or had been terminated were not struck.  AThe decision to
strike a particular venireperson is not susceptible to rigid quantification;
rather, it is a fluid process, often hinging on the interaction of a number of
variables and permutations.@  Cantu v. State, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992).  Disparate treatment cannot automatically be
imputed in every situation in which one of counsel=s reasons for
striking a juror would technically apply to another juror who was not
struck.  See id.; Contreras,
56 S.W.3d at 280.  While jurors are not Acookie cutters@ and need not have
identical characteristics to create a basis for comparison, the trial court
should evaluate together all reasons for the strike and determine whether
differences between jurors are significant. 
See Miller-El, 125 S. Ct. at 2329 & n.6; Cantu, 842
S.W.2d at 689.  In this case, though
other jurors had past employment issues, they did not also feel they had been
discriminated against, express a very strong reaction to the An-----@ word issue, or
laugh when a white person said he had an African-American friend.  These significant differences provided a
race-neutral basis for distinguishing Pickett from other jurors.

The trial court=s decision to deny
Davis=s Batson
challenge to Fisk=s strike of Pickett is reasonable and
supported by the record.  Thus, we find
no abuse of discretion.

Juror No. 9, Euline Edmund

In an employment discrimination case, an
employer=s
anti-discrimination policies are relevant to punitive damages.  See Kolstad v. Am. Dental Ass=n, 527 U.S. 526,
545 (1999).  Therefore, Fisk=s counsel
questioned how jurors felt about Fisk=s policies in
relation to Blanton=s use of the word An-----.@  Euline Edmund said, AWell, having a
policy is one thing; but actually implementing the policy is another
thing.  If [Blanton] is still employed,
and depending on how long he=s been doing this,
that would definitely sway me.@  Fisk=s counsel struck
Edmund because of counsel=s belief, based on this answer, that she
would be plaintiff-oriented on punitive damages.  He also observed that Edmund was one of the
jurors with the strongest feelings on the use of the An-----@ word, citing her
admission that she Awould have a real hard time@ listening to the
evidence because she was so offended. 
Finally, he noted that Edmund indicated she agreed with the notion that
whether a company had other African-American employees was irrelevant to racism.








These are legitimate reasons for Fisk=s counsel striking
Edmund.  Striking because of an
unfavorable position on punitive damages or a defense theory is
race-neutral.  See Hatchett v.
State, 930 S.W.2d 844, 846 & n.1 (Tex. App.CHouston [14th
Dist.] 1996, pet. ref=d) (noting that unfavorable
position on punishment issue was legitimate basis for striking jurors).  Fisk=s counsel=s unchallenged
observations are evidence of her nonverbal reactions regarding the relevance of
other African-American employees and the use of the An-----@ word, as did
Edmund=s admission that
she would have a hard time listening to the evidence because Blanton had used
that word.  Davis points out that a white
juror also said the use of the An-----@ word would make
it difficult to listen to the evidence; however, this juror did not also
express an unfavorable view on punitive damages and openly oppose the theory
that other African-American employees are relevant to a company=s alleged
racism.  These differences are
significant and directly related to the case. 
Thus, the trial court did not abuse its discretion in rejecting Davis=s Batson
challenge regarding Edmund.

Juror No. 12, Patrick Daigle

Patrick Daigle works for Continental
Airlines.  He explained during voir dire
that he serves as a liaison between management and employees when employees
have complaints, and he assists in resolving those complaints.  Some complaints involve allegations of race
discrimination, although he has never personally handled one.  Daigle emphasized that he did not think this
experience would cause him to favor Davis and that he could be fair.  Fisk=s counsel explained
that he struck Daigle because Daigle seemed Atoo ready to
believe@ that his employer
has discriminatory employment practices. 
Also, Fisk=s counsel claimed that Daigle=s reactions to
questions on the issue of punitive damages indicated to him that Daigle was Amost clear@ that Acorporations
should be punished with the use of punitive damages.@[3]








Davis complains that the record does not
indicate Daigle was biased toward punitive damages, but, as explained above,
Fisk=s counsel=s uncontradicted
statement to the contrary during the Batson hearing alone constitutes
evidence.  Davis contends that striking
Daigle based on his liaison job is improper because Daigle repeatedly said he
would be fair.  However, counsel is not
required to take all voir dire answers at face value.  Counsel Amay base
peremptory challenges on . . . legitimate hunches and past experiences so long
as racial discrimination is not the motive.@  Frazier v. State, 909 S.W.2d 255, 258 (Tex. App.CHouston [14th Dist.] 1995, no pet.); see
also Purkett, 514 U.S. at 768 (noting that reasons for a strike may be Asilly or
superstitious@ as long as they are race-neutral).  Finally, Davis argues that Fisk=s counsel engaged
in disparate questioning because he asked Daigle if he was related to one of
counsel=s other clients
but did not also question a white juror who was an employee of a client grocery
store.  Daigle answered that he was not
related to that client, and Fisk=s counsel did not
cite Daigle=s answer as a basis for the strike.  Thus, any disparity in questioning is not
evidence of pretext in this situation.  See
Miller-El v. Cockrell, 537 U.S. 322, 344 (2003) (A[I]f the use of
disparate questioning is determined by race at the outset, it is likely a
justification for a strike based on the resulting divergent views would be
pretextual.@). 
We conclude the trial court did not abuse its discretion in denying
Davis=s challenge as to
Daigle.

Juror No. 18, Leon Randle

Leon Randle is a warehouse custodian with
a high school education.  At the Batson
hearing, Fisk=s counsel stated that given Randle=s education and
employment, he feared Randle would not be able to grasp some of the
complexities of Fisk=s defense. 
Also, Fisk=s counsel had obtained a substantial
judgment against Randle=s employer and was concerned that Randle
might be aware of the litigation. 
Finally, Fisk=s counsel noted that Randle had been
terminated from a previous job.[4]








Davis argues that Fisk=s reference to
Randle=s education is
vague because he was not questioned on the subject and because other jurors
with only a high school education were not struck.  However, Fisk points out that Randle
misspelled four words on his juror information card, including his own job position.[5]  Poor literacy skills is a legitimate basis
for striking a juror.  See Barnes v.
State, 855 S.W.2d 173, 174 (Tex. App.CHouston [14th Dist.] 1993, pet. ref=d).  Though other jurors may have had the same
amount of formal education, there is no indication they had similar literacy
problems.  Davis also complains that
because Fisk=s counsel did not question Randle about
his knowledge of the prior judgment against his employer, using it as a basis
for a strike suggests discrimination. 
However, Fisk=s counsel did not question Randle because
doing so risked creating the very prejudice Fisk wanted to avoid.  We find no error in the trial court=s decision to deny
Davis=s Batson
challenge as to Randle.

Juror No. 21, Mary Harts

Mary Harts is a physical therapist.  Fisk=s counsel
questioned her about whether her occupation would make her more sympathetic to
Davis=s claims for
emotional distress.  Harts explained that
she would be empathetic but not sympathetic. 
When Harts described her job and prior experiences of discrimination,
Fisk=s counsel became
concerned that Harts was unhappy with her job. 
After questioning her at the bench, he learned that Harts was actually
satisfied with her job.  Fisk=s counsel struck
Harts because he was concerned that, based on her job, she would be more likely
to believe Davis=s emotional distress claims.  She also had laughed when a white juror
claimed to have an African-American friend and had reacted strongly to the An-----@ word issue.  Fisk=s counsel was also
bothered that Harts was quiet during most of voir dire.  Finally, Fisk=s counsel felt
compelled to strike Harts because he had singled her during voir dire and
believed she might hold that against Fisk.








Davis complains Fisk lacks evidence of the
nonverbal bases for striking Harts, but, as explained above, counsel=s uncontradicted
statements regarding her cues are sufficient evidence.  Davis points to Harts=s statements that
she did not sympathize with Davis, but Fisk was entitled to question that
response, especially in light of her comment that she would empathize with
Davis.  Fisk=s counsel did not
ask many direct questions of Harts in voir dire, and Davis argues that Fisk
cannot thereby use Hart=s silence as a basis for striking
her.  However, Harts had the opportunity
to speak, as did the other jurors, and her perceived silence is a race-neutral
reason for striking her.  See Barnes,
855 S.W.2d at 174 (AThe State may also strike a prospective
juror who appears inattentive during the voir dire process.@).  The trial court did not abuse its discretion
in allowing Fisk=s counsel to strike Harts.

We have determined that the trial court
did not abuse its discretion in denying Davis=s Batson
challenge to the five strikes at issue, and thus we overrule appellant=s first issue.

                                               Evidentiary
Rulings

In his fourth
issue, Davis claims the trial court erred in four evidentiary rulings, the
cumulative effect of which resulted in an improper verdict.  We review a trial court=s evidentiary
rulings for an abuse of discretion.  E.I.
du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 558 (Tex.
1995).  A trial court abuses its
discretion if it acts unreasonably or without reference to any guiding rules or
principles.  Id.  

1.  Elliot Avery

One of Davis=s trial theories
was that Fisk targeted African-American employees for termination.  Davis called Elliot Avery, who testified that
Davis was not responsible for the problems at Goodson and that he believed
Davis=s termination was
racially motivated because he was Aset up to fail.@  Fisk sought to discredit Davis=s theory that it
targeted African-Americans for termination by showing that Avery, who is also
African-American, had been accused of three instances of serious misconduct and
yet had not been terminated.








Davis objected, arguing that Fisk was
attempting to discredit Avery through prior acts of misconduct in violation of
Texas Evidence Rules 404(b) and 608.  The
trial court overruled Davis=s objection and
granted him a running objection to Athis entire line
of questioning.@ 
Fisk proceeded to question Avery on his prior misconduct and later
questioned Kenjura and Blanton on these same issues.  Davis did not renew his prior objection
during either Kenjura=s or Blanton=s testimony.  AA running
objection when requested by [counsel] and granted by the trial court does not
preserve error when another witness testifies to the same matter without
objection.@  Scaggs
v. State, 18 S.W.3d 277, 292 (Tex. App.CAustin 2000, pet.
ref=d); see also
Sattiewhite v. State, 786 S.W.2d 271, 283 n.4 (Tex. Crim. App. 1989) (AWe found no
support in the case law for a proposition that a running objection on a
particular matter would preserve error whenever that matter was brought up
again in the trial, and regardless of what witness brought it up or what
time it was brought up.@); Ross v. State, 154 S.W.3d 804,
811B12 (Tex. App.CHouston [14th
Dist.] 2004, pet. filed) (finding running objection during one witness=s testimony Arelieved
[defendant] of having to reassert his objection while [witness] testified@ but did not
preserve error regarding additional testimony on the same subject from other
witnesses).  Thus, any error in allowing
Avery to be questioned regarding prior misconduct was waived by Davis=s failure to
object to testimony about the misconduct by subsequent witnesses.  Leday v. State, 983 S.W.2d 713, 718
(Tex. Crim. App. 1998); Ross, 154 S.W.3d at 812.

2. 
Stephen Janacek

Fisk terminated Davis=s employment on
June 12, 2001.  From October 2001 to
March 2002, Davis worked in the construction business at a company called
Encompass.  Davis=s separation
papers show he was laid off from Encompass. 
Fisk presented testimony from Stephen Janacek, Davis=s supervisor at
Encompass, who testified that Davis=s work there was
unsatisfactory but that Encompass chose to lay him off rather than terminate
him because it feared being sued.  Fisk
argued that this evidence was relevant to show that Davis failed in his duty to
maintain subsequent employment.  The
trial court agreed and admitted the evidence.








Davis claimed damages for lost wages, and
a plaintiff seeking damages in a termination suit has a duty to mitigate
damages not only by seeking substantially similar employment after termination
but also by reasonably maintaining that employment.  See Patterson v. P.H.P. Healthcare Corp.,
90 F.3d 927, 936 (5th Cir. 1996) (noting that the duty of mitigation
necessarily Aincludes an obligation >to make reasonable
and good faith efforts to maintain that job once accepted=@ and finding that
employee who was fired from a subsequent job for his own misconduct did not
meet that duty); see also Deffenbaugh‑Williams v. Wal‑Mart
Stores, Inc., 156 F.3d 581, 591 (5th Cir. 1998) (A>[I]t necessarily
follows that the claimant must also use reasonable diligence in maintaining
that substantially similar employment.=@); Coastal
Mart, Inc. v. Hernandez, 76 S.W.3d 691, 698 (Tex. App.CCorpus Christi
2002, pet. dism=d by agr.) (AA wrongfully
discharged employee has a duty to mitigate damages by making a good faith
effort to obtain and retain employment.@).

Davis argues that the trial court abused
its discretion in admitting Janacek=s testimony,
claiming it was not relevant to the issue of mitigation because he exercised
diligence in finding employment with Encompass and maintained that employment
until he was laid off.  However, the
trial court reasonably concluded that evidence that Davis lost his job at
Encompass because of poor performance showed he failed in his duty to maintain
substantially similar employment.  Davis
also argues that Janacek was not a designated corporate representative of
Encompass and thus could not contradict the official explanation that Davis was
laid off rather than terminated.  Davis
cites no authority for this theory, and Janacek was Davis=s supervisor and
testified to his direct knowledge of Davis=s performance and
the rationale behind Encompass=s decision-making
process.  The trial court did not abuse
its discretion in admitting Janacek=s testimony.

3. 
Anti-Discrimination Policy








Davis next argues that the trial court
erred in admitting testimony and documentary evidence of Fisk=s
anti-discrimination policy because that policy was not produced during
discovery.  At trial, Davis primarily
argued that the policy was not relevant to any issue in the case and also
stated simply that A[i]t was not produced.@  In his brief, Davis identifies a specific
discovery request and explains why Fisk should have produced its
anti-discrimination policy in response. 
However, he failed to explain this specific basis for his objection to
the trial court, and his general objection that A[i]t was not
produced@ preserves nothing
for our review.  See Tex. R. App. P. 33.1(a); Rogers v. State, 756 S.W.2d 332, 342 (Tex. App.CHouston [14th Dist.] 1988, pet. ref=d).

4. 
Corporate Identity

Tyco owns Fisk, but Tyco was not a party
to the suit.  The trial court prohibited
Davis from referring to Tyco.  Davis
argues this was an abuse of discretion because he claims that when he accused
Blanton of racial discrimination, Blanton Athreatened@ him by stating, AWell, this is Tyco
now and not Fisk.@ 
Davis claims this alleged threat was an Aoperative fact@ that should have
been admitted.  The trial court allowed
Davis to repeat the statement but without referring to Tyco.  The trial court noted that Tyco was not a
party to the suit and was clearly concerned that any reference to Tyco would
prejudice the jury against Fisk because of Tyco=s recent,
well-publicized financial scandals.  See
Long v. State, 130 S.W.3d 419, 427 (Tex. App.CHouston [14th
Dist.] 2004, no pet.) (noting that Aunfair prejudice@ under Rule 403
means a tendency to suggest a decision on Aan improper basis@).  Basing its ruling on such considerations was
well within the trial court=s discretion under
Texas Rule of Evidence 403. 

We overrule Davis=s fourth issue.

                                               Post-Trial
Sanctions

Davis filed a post-trial motion for
sanctions, arguing that Fisk should be sanctioned for alleged discovery
violations revealed during trial.  The
trial court denied Davis=s motion, and in his fifth issue, Davis
claims this was error.

A trial court has broad discretion in
matters of discovery and sanctions, and we will reverse a trial court=s ruling denying a
motion for sanctions only for abuse of discretion.  Johnson v. Davis, No. 14-04-00206-CV,
__ S.W.3d __, 2005 WL 1772075, at *8 (Tex. App.CHouston [14th
Dist.] July 26, 2005, no pet. h.).








Davis claims that Fisk falsified two of
its interrogatory responses.  In his
first interrogatory, Davis asked Fisk to identify Aeach person who
participated in the decision to terminate@ Davis and Aeach person who
did not agree with the decision to terminate.@  Fisk responded that Blanton, Sellers, and
Kenjura Awere in collective
agreement [that] the decision to terminate Mr. Davis was indeed in the best
interest for the division@ and that AFisk is not aware
of any person, other than [Davis], who did not agree with the decision to
terminate.@ 
Davis argues that Kenjura=s and Blanton=s testimony that
Kenjura made the termination decision and Blanton opposed it directly
contradict this interrogatory response. 
However, the trial testimony established that Kenjura was the first to
recommend termination and was the most influential in the termination process,
although he did consult Blanton. 
Further, Blanton testified that he was in favor of terminating Davis but
thought the termination should be delayed until Goodson was finished.  That is consistent with the interrogatory
response that Kenjura and Blanton were in Acollective
agreement@ that termination was best and that Fisk
knew of no one other than Davis who opposed the decision to terminate.  The trial court did not abuse its discretion
in refusing to sanction Fisk for its response to Davis=s first
interrogatory.

Davis=s nineteenth
interrogatory asked Fisk to describe Kenjura=s subsequent separation
from employment with Fisk, including whether the separation was a termination
and whether he was under investigation for misappropriation of funds or any
other alleged wrongdoing.  Fisk responded
that Kenjura was part of a reduction in force and that A[t]here was no
investigation made.@  At
trial, Carl Taskalos, former president of Fisk Technologies, testified on
cross-examination as follows:

Q.      [W]as
Mr. Kenjura terminated?

A.      Yes, he was.

Q.      So
if in response to an interrogatory answer Fisk represented that Mr. Kenjura was
laid off as a reduction in force and signed that statement under oath, that
would be a lie?

A.      I
really don=t know what the specific reasons
were for terminating Mr. Kenjura=s employment or if it was a termination or a layoff.  Sometimes they can be one and the same.  So I really can=t answer your question.

Q.      So
was he terminated, or was he not terminated?








A.      Well,
he=s no longer with the company and
his employment was terminated.

. . . . 

Q.      Isn=t it true, Mr. Taskalos, that Mr.
Wade gathered evidence of financial misdeeds by Kenjura and provided that
information to you?

A.      He
didn=t provide it to me personally.  I know he did generate some reports that were
requested of him, but he didn=t do anything on my behalf. 
At  that point in time I was
already running One Source Building technologies, which is a sister company of
Fisk, and I wasn=t really involved with Fisk
Technologies.

. . . . 

Q.      Part
of that investigation included at 19,000-dollar landscaping job that was
charged to the Compaq project; isn=t that true?

A.      I
heard about that, but I really don=t know any details about it.

. . . . 

Q.      Was
[sic] there two million dollars in losses discovered after Mr. Kenjura left
Fisk?

A.      I
don=t know if that was the exact
number.  It was a significant
number.  

I don=t know if two
million is the correct number.   Davis
claims this testimony proves Fisk=s response to his interrogatory
was false because Kenjura was investigated and then terminated, not laid
off.  However, Taskalos testified he was
unsure whether Kenjura was terminated or laid off and had little, if any,
personal knowledge of an investigation involving Kenjura.  This vague testimony does not clearly
establish a false interrogatory answer, and the trial court denied Davis=s motion for
sanctions, noting there was no indication that Fisk had engaged in any
intentional misconduct sufficient to warrant post-trial sanctions.  The trial court did not abuse its discretion
in denying Davis=s motion for sanctions based on Fisk=s response to
interrogatory nineteen.

We overrule Davis=s fifth issue.

                                                              

 








                                                   Conclusion

Having overruled all of Davis=s issues, we
affirm the trial court=s final judgment of May 21, 2004 and its order
denying Davis=s motion for sanctions dated June 24, 2004.

 

 

 

 

 

 

/s/      Leslie Brock Yates

Justice

 

 

 

 

Judgment
rendered and Opinion filed January 12, 2006.

Panel
consists of Chief Justice Hedges and Justices Yates and Anderson.

 











[1]  In a wrongful
termination case based on race, the liability standards under both the TCHRA
and ' 1981 mirror Title VII of the Civil Rights Act of 1967, 42 U.S.C. ' 2000e et seq. (2000 &
Supp. II 2002).  See Pratt v. City of Houston, 247 F.3d
601, 606 n.1 (5th Cir. 2001); Winters v. Chubb & Son, Inc., 132
S.W.3d 568, 574 (Tex. App.CHouston [14th Dist.] 2004, no pet.).  For this reason, and because the parties have
not argued that any unique aspect of ' 1981 should alter
our analysis, we will focus on the TCHRA.





[2]  Fisk shuffled
the jury before voir dire.  Seven of the
twelve African-Americans on the panel were in the top twenty-five of the forty
panelists when Fisk shuffled.  Based on
this fact alone, Davis asserts that AFisk=s decision to shuffle the jury was based solely on its
visual appearance@ and therefore, under Miller-El, erodes the
credibility of Fisk=s assertion that its strikes were race-neutral.  See Miller-El v. Dretke, 125 S. Ct.
2317, 2332B33 (2005).  The
Court in Miller-El held that the prosecutor=s shuffles were a factor suggesting discrimination not
only because of the predominant number of African-Americans at the front of the
panel but also because the prosecution delayed making its objection to the
defense=s shuffle until after the racial composition of the
panel was revealed and the district attorney=s office
had admitted it had previously shuffled juries to manipulate their racial
composition.  See id. at
2333.  There is no such additional
evidence in this case.





[3]  Daigle also
stated in voir dire that a former employer had discriminated against him.  Though Fisk cited this as a reason for its
strike in its brief, Fisk=s counsel did not present this reason to the trial
court during the Batson hearing. 
Davis argues that Fisk therefore waived this argument.  We need not decide whether Fisk can assert
this completely new reason for the first time on appeal because we conclude
that the trial court did not abuse its discretion in allowing Fisk=s strike based on the reasons given at trial.





[4]  Fisk=s counsel also stated at the Batson hearing
that Randle had nonverbally indicated that he had experienced
discrimination.  In its appellate brief,
Fisk acknowledges this was probably a mistake in counsel=s notes.  In
this case, particularly given the combination of legitimate reasons for
striking Randle, such a discrepancy does not suggest discrimination.  See Francis, 909 S.W.2d at 164 (noting
that in a Batson hearing, counsel Awork
from limited notes jotted quickly in a small space@ and that small discrepancies based on these notes do
not Aamount to a pretense on their face@); see also Gibson v. State, 144 S.W.3d 530,
533B34 (Tex. Crim. App. 2004) (stating that courts are to
examine Athe genuineness instead of reasonableness@ of reasons given for the strike).





[5]  Davis argues
that because Fisk=s counsel did not point out these misspelled words
during the Batson hearing, he may not do so now on appeal.  However, this information supports Fisk=s trial argument regarding Randle=s education. 
Both sides are allowed to raise new arguments on appeal that support the
reasons given at trial as long as the underlying evidence was in the record, as
were the juror information cards here.  See
Francis, 909 S.W.2d at 163.